[Cite as *In re C.H.*, 2013-Ohio-633.]

STATE OF OHIO                )              IN THE COURT OF APPEALS
                             )ss:           NINTH JUDICIAL DISTRICT
COUNTY OF WAYNE              )

IN RE: C.H.                                 C.A. No.      12CA0055


                                            APPEAL FROM JUDGMENT
                                            ENTERED IN THE
                                            COURT OF COMMON PLEAS
                                            COUNTY OF WAYNE, OHIO
                                            CASE No.      09-0129-AND

DECISION AND JOURNAL ENTRY

Dated: February 25, 2013

---

WHITMORE, Judge.

{¶1}    Appellant, Jamie S. ("Mother"), has appealed from a judgment of the Wayne County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her minor child, C.H., and placed him in the permanent custody of Wayne County Children Services ("CSB").  This Court affirms.

I

{¶2}    C.H., born March 16, 1999, is the biological son of Mother and her boyfriend, Bryan H. ("Father").  Mother has five other children, M.S., A.S., D.S., R.S., and W.H., none of whose custody is at issue in this appeal.  Father is not a party to this appeal.

{¶3}    The children range in age from 13 to 22, with C.H. being the youngest and the only minor with unresolved custody.  No one has disputed that the family has long been involved with children services.  The family was apparently involved with children services agencies in two counties for at least a decade, including a prior removal of the children from the home.  At

some point, Mother surrendered her parental rights to W.H., who is autistic. In April 2007, the family again came to the attention of CSB when the agency learned that A.S., at age 14, delivered a baby and no one apparently knew she was pregnant. The baby was found to be the biological child of Mother's boyfriend, Bryan H., who was subsequently convicted of two counts of unlawful sexual conduct with a minor and sentenced to four years in prison. Also, M.S. and R.S. were each adjudicated delinquent based on rape while in foster care. In addition to issues of sexual abuse within the family, the agency was concerned with deplorable living conditions in the home and Mother's mental health. A.S. was reportedly taking on the role of parent, not only for her baby, but also for her younger siblings.

{¶4} After A.S. delivered her baby, the family agreed to work with the agency on a voluntary basis. Eventually, on February 20, 2009, CSB filed a dependency complaint in juvenile court and sought temporary custody of C.H. The case proceeded until CSB filed a motion for permanent custody, and the trial court granted the motion.

{¶5} After Mother initiated an appeal of that decision, CSB moved to vacate the trial court judgment in the interest of justice. The caseworker that had been assigned to the case was terminated from her position with the agency for reasons that may have impacted her credibility in the case. The trial court vacated the permanent custody decision, and CSB filed another motion for permanent custody. Following another hearing, the trial court granted the motion and terminated the parental rights of both parents. Mother has appealed from that judgment and has assigned two errors for review.

II

Assignment of Error Number One

THE TRIAL COURT ERRED IN FINDING THAT PERMANENT CUSTODY WAS SUPPORTED BY CLEAR AND CONVINCING EVIDENCE; THE GRANT OF PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE; AND WAS CONTRARY TO THE BEST INTEREST OF THE MINOR CHILD.

{¶6}    Through her first assignment of error, Mother has asserted that the judgment of the trial court is not clearly and convincingly supported by the evidence.  Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D).  *See* R.C. 2151.414(B)(1) and 2151.414(B)(2).  Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."  *In re Adoption of Holcomb,* 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶7}    The trial court found that the first prong of the permanent custody test was satisfied because C.H. had been in the temporary custody of CSB for at least 12 of the prior 22 months.  Mother does not contest that finding, but challenges the finding that permanent custody is in the best interest of the child.

{¶8} When determining whether a grant of permanent custody is in a child's best interest, the juvenile court must consider all the relevant factors, including those enumerated in R.C. 2151.414(D): the interaction and interrelationships of the children, the wishes of the child, the custodial history of the child, and the child's need for permanence in his life. *See In re R.G.*, 9th Dist. Nos. 24834 & 24850, 2009-Ohio-6284, ¶ 11. "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." *In re Smith*, 9th Dist. No. 20711, 2002 WL 5178, *3 (Jan. 2, 2002); *see also In re Palladino*, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, ¶ 24.

{¶9} Mother's argument has focused on the first best interest factor. She has claimed that C.H. had strong relationships with his family and that ending those relationships would be detrimental to the child. In specific, she has pointed to C.H.'s relationship with her, with his sister A.S. and her daughter, and with his brother R.S.

{¶10} C.H. is a thirteen-year-old child, who has been in foster care for three and one-half years. He is in counseling to address trauma from sexual abuse and neglect; to learn to manage emotions, behaviors, and attention deficit symptoms; and to deal with grief and loss issues. C.H. has a borderline intellectual function with an IQ of 73 and nighttime enuresis, bedwetting. This child was home-schooled while living with Mother. One of the C.H.'s counselors stated that he is "very much of a people pleaser," and is at risk of becoming a victim again unless he is able to stand up for himself.

{¶11} C.H. and his older brother, R.S., were initially placed together in the same foster home, but were separated after R.S. was determined to have raped C.H. C.H. was then moved to a therapeutic foster home. C.H. recently had a therapeutic "apology" session with his brother,

and the therapist anticipated that the two brothers might be able to have supervised visits in the future. Despite his anger at R.S. for the assault, C.H. misses him.

{¶12} As to C.H.'s relationship with Mother, they are scheduled for weekly visits at the visitation center. Mother testified that the visits go well and that they play cards together. However, Mother missed nearly half the visits, which upset and angered C.H. At the age of 13, C.H. was aware of the visitation schedule and Mother's absences. Many of Mother's missed visits were due to the fact that she moved many times and resided in Columbiana County for ten months and in Pennsylvania for seven months. CSB offered her transportation while she lived in Wayne County, but Mother had to depend on friends for transportation when she lived out-of-county as she did not have a driver's license.

{¶13} Mother has been in counseling to address major depression, coping skills, and a dependent personality disorder. Counselors sought to address issues related to Mother's victimization and that of her children. Although Mother was said to have made some progress in addressing boundaries, her very poor attendance left her counseling objectives unsatisfied. Mother's frequent housing changes meant that she changed counselors at least three times. According to testimony from the CSB supervisor and Mother's current counselor, Mother attended about half of the sessions that were actually scheduled and there were additional gaps due to changes of counselors. On appeal, Mother has claimed that the original assessments were out-of-date, but as of Mother's last appointment, her current counselor testified that Mother needs more therapy. Mother is not employed, but, according to the guardian ad litem, received social security disability benefits. At the time of the permanent custody hearing, Mother had not established a stable residence, but had moved nine times during these proceedings, mostly staying with friends.

{¶14} C.H.'s favorite visits were with his sister and his niece. C.H. would always "brighten up" when he discussed his visits with them, and he "absolutely adores" his niece. C.H. was upset when Mother recently moved to A.S.'s home for a short stay because he was not permitted to visit his sister and niece in their home while Mother was staying there. A.S. and her daughter are the strongest family ties for C.H.

{¶15} C.H. expressed his wish for future placement to his guardian ad litem. The guardian ad litem reported that C.H. does not want to live with Mother and has been consistently ambivalent about continuing contact with her. He would like Mother to change her behavior, but he is realistic and realizes that she has not yet changed. According to the guardian ad litem, C.H. does not want to remain in foster care either, but would like to be adopted into a permanent family. His preference would be to be adopted by his sister, A.S. The guardian reported that if things did not work out with A.S., and that a new family was willing to adopt him, C.H. would be willing to meet with them.

{¶16} Both of the child's counselors corroborated the opinion of the guardian ad litem, and testified that, although C.H. remained open to having visits with Mother, he was very clear and consistent in stating that he never wanted to return to live with her. He knew that he would not be taken care of if he lived with Mother. At the same time, he cares about Mother and does not want to hurt her feelings by stating his desire to be adopted.

{¶17} Several witnesses addressed the impact on C.H. of an order terminating parental rights. While his counselors believe there would be a period of grief and loss if visits with Mother ended, they also believe C.H. would eventually adjust. The counselors, the caseworker, and the guardian ad litem all believed that it would be more difficult for C.H. to end his relationship with A.S. The CSB caseworker explained that adoptions involving older children

are sometimes treated differently in that such children are allowed to continue some of their pre-existing relationships, subject to input from adoptive parents and therapists.

{¶18} C.H.'s custodial history is not detailed in the record except that C.H. was removed from his home by children services in 2002 and/or 2003, but was eventually returned. He was removed again in February 2009 and has remained in foster care for approximately three and one-half years, until the time of the permanent custody hearing.

{¶19} Finally, there was testimony before the court that C.H. needs a permanent home. In fact, that is the primary wish of this thirteen-year-old child. Mother testified herself at the hearing and addressed the question of C.H.'s future placement. She admitted that she is not ready for C.H. to come live with her and stated that she still has problems that she needs to work through. Mother conceded that she faces the same challenges that existed when her children were first removed, "and more." Mother's preference was that her son would be placed in a planned permanent living arrangement, but that is not possible since the agency has not requested it. *See In re A.B.*, 110 Ohio St.3d 230, 2006-Ohio-4359, ¶ 37. In addition, no person moved for legal custody of the child prior to the hearing. *See* R.C. 2151.353(A)(3).

{¶20} The current foster family has provided a good home to C.H. for two and one-half years and he has done well there, but that family is not in a position to offer an adoptive home to him. A.S. had not been investigated for placement, but she has been allowed to have C.H. in her home for overnight visits. Three other relatives were investigated for placement, but none were approved. Unfortunately, the factual situation in this case left the trial court with few options. The caseworker conceded that it was not going to be easy to place a 13-year old child with behavioral problems and a history of abuse, but the agency would assign a separate caseworker to that task and would make every effort to find him a safe and stable home.

{¶21} Upon consideration, this Court concludes that the evidence clearly and convincingly established that permanent custody was in the best interest of the child. Mother's first assignment of error is overruled.

Assignment of Error Number Two

THE TRIAL COURT ABUSED ITS DISCRETION BY ALLOWING TESTIMONY REGARDING CHILDREN SERVICES RECORDS WHICH WERE NOT ENTERED INTO EVIDENCE.

{¶22} In her second assignment of error, Mother has argued that the trial court erred in permitting a Wayne County caseworker to testify regarding a Columbiana County caseworker's purported description of the deplorable conditions in one of Mother's residences in that county while doing a "courtesy supervision" for the Wayne County agency. Mother's attorney objected to the testimony because it was based on records that had not been introduced into evidence. The records were not authenticated by the individual who created them. The prosecutor has argued that the witness was testifying to his knowledge of agency records. The trial judge overruled the objection and later referred to Mother's "history of . . . unsanitary housing" in his judgment entry. The agency presented evidence of the poor condition of Mother's home at the time of the initial removal of the children, but indicated that A.S.'s home, where Mother was currently residing, was appropriate. The agency failed to offer evidence of the condition of Mother's several other residences in a form that was admissible.

{¶23} As this Court has previously emphasized, Juv.R. 34(I) specifically states that the rules of evidence shall apply in a hearing on a motion for permanent custody. Thus, hearsay is inadmissible in such a proceeding unless it falls within a recognized exception to the hearsay rule. Nevertheless, even if this testimony is error, it must be deemed harmless in this case. The primary concern in this case was the victimization that ran rampant and dangerously throughout

this family. Mother admitted she did not fully address the issues that created such risks to herself and to her children. She even conceded that she is presently unable to take care of C.H. and is not ready for him to live with her. She acknowledged that she needs to seek more counseling so that she can look after herself, rather than having a child look after her. Mother also admitted that she does not have stable housing of her own. While a caseworker recently found A.S.'s home to be appropriate, Mother explained that she was only staying there on a temporary basis and expected to leave that home soon after the permanent custody hearing. She did not indicate where she would reside next. Mother testified that she previously stayed with friends because she "couldn't make it on [her] own." Although housing or housekeeping was not technically made a part of Mother's case plan, her frequent moves during the trial court proceedings inhibited Mother's progress in counseling as well as her ability to visit consistently with her son. Mother's second assignment of error is overruled.

### III

{¶24} Mother's two assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the

period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

                                                         BETH WHITMORE
                                                         FOR THE COURT

BELFANCE, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

REBECCA A. CLARK, Attorney at Law, for Appellant.

DANIEL R. LUTZ, Prosecuting Attorney, and NATHAN R. SHAKER, Assistant Prosecuting Attorney, for Appellee.

DANIEL GIGIANO, Attorney at Law, for C.H.

KAREN WIEST, Guardian ad litem.