**[Cite as *In re A.E.*, 2021-Ohio-488.]**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| A.E. | : | No. 19AP-782 |
| | | (C.P.C. No. 16JU-10098) |
| (S.E., | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellant). | : | |
| In the Matter of: | : | |
| W.P., Jr. | : | No. 19AP-783 |
| | | (C.P.C. No. 16JU-10099) |
| (S.E., | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellant). | : | |
| In the Matter of: | : | |
| A.J. | : | No. 19AP-784 |
| | | (C.P.C. No. 17JU-11312) |
| (S.E., | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellant). | : | |

D E C I S I O N

Rendered on February 23, 2021

**On brief:** *Yeura R. Venters*, Public Defender, and *George M. Schumann*, for appellant.

**On brief:** *Robert J. McClaren*, for appellee Franklin County Children Services.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

SADLER, J.

{¶ 1}  Defendant-appellant, S.E., appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, granting permanent custody of her three minor children to appellee, Franklin County Children Services ("FCCS").  For the reasons that follow, we affirm.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}  S.E. has four biological children.  Her oldest child, F.J., is a minor in the custody of a maternal aunt and she is not involved in this case.  S.E. also has a son, W.P., Jr. (herein W.P.) born January 10, 2010, a daughter, A.J., born March 15, 2012, and a son, A.E., born August 15, 2016.  There is no dispute that R.E. is A.E.'s biological father.  W.P.'s biological father is deceased and the identity of A.J.'s father is unknown.  When A.J. was born, S.E. misrepresented her own identity on the birth certificate and subsequently surrendered physical custody to a couple with whom she was acquainted, A.T. and M.J. When FCCS first became involved with the family, M.J. was raising A.J. as her own child.

{¶ 3}  On the date of A.E.'s birth, August 15, 2016, S.E. tested positive for opioids and admitted taking unprescribed Percocet throughout her pregnancy.  A.E. exhibited withdrawal symptoms as a result of S.E.'s drug use during the pregnancy.  Consequently, on August 22, 2016, FCCS filed a complaint with respect to S.E.'s minor children A.E. and W.P. In Franklin C.P. No. 16JU-10098, FCCS alleged that A.E. was an abused, neglected, and dependent child, and in Franklin C.P. No. 16JU-10099, FCCS alleged that W.P. was a neglected child.  Attorney Tom Gordon was appointed as counsel for S.E., and on August 23, 2016, the court issued a temporary order of custody to FCCS of A.E. and W.P.  The juvenile court appointed attorney, Brian Furniss, as legal counsel for A.E. and W.P., and also as their guardian ad litem ("GAL").  The two children were placed in the temporary legal custody of FCCS and FCCS placed the children with their maternal grandmother, E.W., under an order of protective supervision.

{¶ 4}  On October 10, 2016, the GAL submitted his initial report wherein he recommended an order of temporary custody to FCCS for both W.P. and A.E.  In the report, the GAL noted that W.P. wished to be reunited with his mother and that A.E. was too young to express his wishes.  The juvenile court returned A.E. to his maternal grandmother, E.W.,

but terminated the temporary custody order with regard to W.P. and returned him to S.E., pending adjudication.

{¶ 5} On November 16, 2016, the juvenile court adjudicated both A.E. and W.P. as a dependent child. The initial case plan was adopted by the juvenile court on November 18, 2016. A.E.'s father, R.E., was incarcerated in a community based correctional facility when the assessment was made. The case plan sets the following goals to be completed as a condition of reunification: S.E. will provide a safe, stable living environment for the children where all of their basic needs are being met, ensure that the children receive all medical care as needed, participate in a parent mentor program and follow any recommendation, complete random drug screens at American Court Service ("ACS"), complete an alcohol and other drug assessment ("AOD") if needed, and meet with a caseworker every 30 days, including home visits, in order to discuss case plan progress. The initial case plan also contains the following information about S.E.:

> [S.E.] admitted to being on SSI due to a "cognitive disability". She admitted she has a low IQ and struggled during school as a child. Her cognitive ability has negatively impacted her ability to provide the basic needs for her children. [S.E.] requested communication with the service team through email/text messages. However, she does not have knowledge to activate email onto her cell phone. Although she has difficulties with speech and admitted to a cognitive delay, it has been assessed that the children are not in danger of serious harm due to her delays.

(Nov. 17, 2016 Case Plan at 4.)

{¶ 6} After the initial case plan was approved, the juvenile court terminated the temporary custody order for A.E. and returned him to S.E.'s home under an order of protective supervision by FCCS. W.P. was returned to S.E. on November 16, 2016. However, on April 6, 2017, FCCS submitted a semi-annual review wherein it was noted:

> A safety threat became active during this review period. [S.E.] admitted she relapsed 4 or 5 times since [W.P] and [A.E] have returned home. Also, [S.E.] reported that [A.E.'s] father, [R.E.] who lives in the home also has relapsed. The service team did not report any concerns regarding [W.P.] and [A.E.'s] needs not being met, but stated [S.E.] and [R.E.] relapse episodes increases the risk of [W.P] and [A.E] being maltreated, abused and/or neglected. The supervisor reported that [S.E.] last completed a urine screen on 12/15/16,

which was negative and has missed every other screen since (19 total). [S.E.] shared that she relapsed at the end of January when some friends' death triggered her to use drugs. It was reported that [R.E.] will be going away for 2 weeks to begin alcohol/drug (AOD) treatment by way of the Vivitrol Shot. As a result, the service team is not comfortable with [W.P] and [A.E] being left in [S.E.'s] care. [S.E.] is not linked with any AOD provider at this time. As a result of the before mentioned concerns, the service and [S.E.] came to the agreement of doing an out-of-home safety plan. Maternal grandmother, [E.W.] (previous placement for [W.P] and [A.E.]) was contacted and she agreed to have the children return to her home while [S.E] gets help. Once [S.E.] is stable and sober she will be re-assessed to determine if [W.P.] and [A.E.] can come back home.

(Apr. 6, 2017 Semi-Annual Review at 6.)

{¶ 7} On May 4, 2017, a juvenile court magistrate removed A.E. and W.P. from S.E.'s home and returned them to E.W.

{¶ 8} On or about September 2017, the GAL learned that A.J., who was then living with M.J., was the biological child of S.E., not M.J. The GAL subsequently initiated a maternity proceeding which resulted in a determination that S.E. was, in fact, the biological mother of A.J. On September 11, 2017, FCCS filed a complaint in Franklin C.P. No. 17JU-11312 alleging A.J. was a dependent child. Furniss was also appointed legal counsel and GAL for A.J. on September 21, 2017. The juvenile court issued a judgment entry declaring A.J. dependent on December 14, 2017.

{¶ 9} The juvenile court subsequently adopted an amended case plan involving all three children on March 6, 2018. At that point in time, all three children were living with E.W. However, on September 21, 2018, a juvenile court magistrate found that continued placement of the children in E.W.'s home would be contrary to the welfare of the children and they were removed to the home of other relatives. The three children were eventually placed in the same certified foster home on October 15, 2018. Because W.P. exhibited behavioral problems while in foster care, he was removed from the foster home and placed in a residential treatment facility on December 14, 2018.

{¶ 10} On January 22, 2019, FCCS filed a motion for permanent custody of all three children. On February 27, 2019, the juvenile court appointed independent legal counsel for the three children after Furniss notified the juvenile court that a conflict of interest had

arisen in his representation of W.P. and A.J. with regard to reunification. Furniss remained GAL for all three children. Furniss filed his GAL report with the juvenile court on August 24, 2019. His recommendation regarding custody is as follows:

> With the lack of any sufficient case planning done by members of the family, it is in the best interest of these children that they be placed in the Permanent Court Commitment of FCCS. The children all require a good deal of services but hopefully can find successful permanence with a grant of PCC. It is likely that the foster parents will adopt [A.E.]and [A.J.] It is my true hope that [W.P.] will exhibit growth and an adoptive home can be recruited for him.

(Aug. 24, 2019 Report of GAL at 3.)

{¶ 11} On October 21, 2019, the juvenile court held an evidentiary hearing on the motion for permanent custody. On the date of the hearing, W.P. was nine years of age, A.J. was seven, and A.E. was three.

{¶ 12} S.E. did not appear for the permanent custody hearing and her counsel moved the juvenile court for a continuance. According to counsel, S.E. was unavailable for the hearing because she recently entered a residential drug treatment program at an Ohio facility known as Maryhaven. The trial court denied the motion and proceeded with the evidentiary hearing. Only two witnesses appeared and gave testimony in the matter, FCCS Supervisor, Michael Schilling, and the GAL.

{¶ 13} On October 23, 2019, the juvenile court issued a decision and judgment entry granting the motion for permanent custody and awarding permanent custody of the three children to FCCS. The juvenile court found, by clear and convincing evidence, that the children cannot be placed with either parent within a reasonable time or should not be placed with the parents and that a grant of permanent custody to FCCS was in the best interest of the children.

{¶ 14} S.E. timely appealed to this court from the judgment of the juvenile court. R.E. did not appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 15} Appellant assigns the following as trial court error:

[1.] The minor child, W.P., was completely denied his right to counsel in the permanent court commitment trial where the minor child's attorney had a conflict of interest which resulted

in a complete failure to advocate the minor child's interests as to custody.

[2.] Appellant-Mother was prejudicially deprived of her right to the effective assistance of counsel during the permanent court commitment trial.

[3.] The juvenile court's judgment granting permanent court commitment of the minor children to Franklin County Children Services is against the manifest weight of the evidence.

## III. LEGAL ANALYSIS

### A. Appellant's Third Assignment of Error

{¶ 16} For purposes of clarity, we will consider the assignments of error out of order. In S.E.'s third assignment of error, appellant contends that the decision to award permanent custody of all three children to FCCS was against the manifest weight of the evidence. We disagree.

{¶ 17} At the outset of our analysis, we recognize that "[p]arents have a constitutionally-protected fundamental interest in the care, custody, and management of their children." *In re H.D.,* 10th Dist. No. 13AP-707, 2014-Ohio-228, ¶ 10, citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The Supreme Court of Ohio has acknowledged "the essential and basic rights of a parent to raise his or her child." *In re A.S.,* 10th Dist. No. 20AP-93, 2021-Ohio-218, ¶ 19, citing *In re Murray*, 52 Ohio St.3d 155, 157 (1990). "However, these rights are not absolute, and a parent's natural rights are subject to the ultimate welfare of the child." *In re A.S.* at ¶ 19, citing *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). Under certain specified circumstances, the state may terminate the parental rights of natural parents when such termination is in the best interest of the child. *H.D.* at ¶ 10, citing *In re E.G.,* 10th Dist. No. 07AP-26, 2007-Ohio-3658, ¶ 8.

{¶ 18} In deciding to award permanent custody, the juvenile court must take a two-step approach. *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 18. The court must first determine, by clear and convincing evidence, if any of the circumstances enumerated in R.C. 2151.414(B)(1) exist. *Id. See also In re A.S.* Once the trial court determines that one of the circumstances in R.C. 2151.414(B)(1) applies, the trial court must then determine whether a grant of permanent custody is in the best interest of the child. *In re A.J.,* 10th Dist. No. 13AP-864, 2014-Ohio-2734, ¶ 16; R.C. 2151.414(B)(1).

{¶ 19} In this case, the juvenile court found that the circumstances described in R.C. 2151.414(B)(1)(a) existed.  R.C. 2151.414(B)(1)(a) provides in relevant part as follows:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * and *the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.*

(Emphasis added.)

{¶ 20} "When, * * * one of the bases upon which permanent custody is sought is R.C. 2151.414(B)(1)(a), R.C. 2151.414(E) provides guidance on analyzing whether a child can be reunited with his or her parents."  *In re B.R.,* 10th Dist. No. 18AP-903, 2019-Ohio-2178, ¶ 44.  R.C. 2151.414(E) provides:

> In determining * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
>
> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, *the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.* In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(Emphasis added.)

{¶ 21} S.E. contends that the evidence in the record does not support a finding, pursuant to R.C. 2151.414(B)(1)(a), that she failed continuously and repeatedly to

substantially remedy the conditions causing the children to be placed outside her home. We disagree.

{¶ 22} FCCS Supervisor, Michael Schilling, testified that he was first assigned to S.E.'s family in October 2016. According to Schilling, he reviewed all FCCS activity logs, placement information, semi-annual reviews, and 90-day reviews for the family from the date FCCS first became involved in the case. According to Schilling, the records show that W.P. and A.E were returned to S.E.'s home on October 11 and November 16, 2016, respectively, but that FCCS was required to remove the children when S.E. admitted to her caseworker, during a March 29, 2017 administrative review, that she had relapsed and was actively using illegal drugs.

{¶ 23} Schilling testified that S.E.'s caseworker successfully linked S.E. with the Columbus Department of Health ("CDH") for the purpose of an AOD assessment and parenting classes. According to Schilling, the FCCS caseworker provided S.E. with bus passes and gasoline cards so she could get to her scheduled appointments but CDH involuntarily removed S.E. from the program due to her disruptive behavior in group therapy sessions. Schilling testified that S.E. never went back to finish the AOD assessment and the parenting classes even though her caseworker made diligent efforts to re-link her with willing service providers.

{¶ 24} Schilling testified that FCCS conducted a semi-annual review of S.E.'s case plan shortly before the permanent custody hearing on October 21, 2019. According to Schilling, the FCCS documentation shows that S.E. appeared at ACS for six drug screenings between September 18 and October 11, 2019, and that the results of each of those screenings were positive for suboxone, cocaine, and marijuana. Schilling testified that he did not believe S.E. had a prescription for suboxone. Schilling maintained that FCCS records showed that, prior to recommencing drug screening in September 2019, S.E. had last appeared at ACS for a drug screening in September 2018. The juvenile court noted in the decision on permanent custody that missed drug screenings are considered positive.

{¶ 25} In our view, Schilling's testimony provides clear and convincing evidence that S.E. continuously and repeatedly failed, for a period of three years, to complete the AOD assessment and drug screenings that were necessary for S.E. to substantially remedy the conditions that resulted in the removal of A.E. and W.P. in August 2016. The evidence also

establishes that S.E. failed to do so even though FCCS provided S.E. with the resources needed to complete those requirements of the case plan.

{¶ 26} With regard to S.E.'s parenting skills, S.E.'s counsel asked Schilling on cross-examination why FCCS had issues with S.E.'s parenting skills when all of her observed interactions with her children were considered appropriate:

> A. Well, we had concerns with how she was parenting [W.P] just because she didn't believe that -- that -- she -- she -- that [W.P.] needed intensive therapy, but she wouldn't like-- she-- he's just being a kid-
>
> Q. Okay.
>
> A. -or he'll get over it, it's just a phase; that and then not letting us know about A.J., just falsifying the documentation of giving up this child to this other person. And so, the parenting piece was just there to kinda help her learn some of those good parenting techniques. And she would have been able to participate in some parenting programming through the Health Department, but she left before the AOD component was completed.
>
> Q. Given her visitation and her weekly visits, was there anything in the visitations that could lead to you-- lead you to believe that she possibly didn't need mentoring at all at that point since there were no concerns raised?
>
> A. No, I think she does. From what I gathered, she would bring multiple people to visits so that  they would assist  her or actually do the parenting themselves.
>
> Q. Oh.
>
> A. She gave -- she agreed for her oldest child to be in the legal custody of a relative. She altered a birth certificate for her daughter to be with somebody else. She didn't believe that her oldest son needed intensive therapy and he was killing the animals and -- and hurting his, you know, his broth -- being aggressive with his brother. And then the baby she, you know, was using throughout the pregnancy. So, we felt that it would best that she learn some parenting techniques to kind of help, you know, deal with all the children should they be able to be reunified.

(Oct. 21, 2019 Tr. at 32-34.)

{¶ 27} In our view, the record contains clear and convincing evidence that S.E. continuously and repeatedly failed, for a period of three years, to acquire the parenting skills necessary for S.E. to substantially remedy the conditions that resulted in the removal

of A.E. and W.P. in August 2016. The evidence in the record also contains clear and convincing evidence that S.E. failed to do so even though FCCS provided S.E. with the resources needed to complete this requirement of the case plan.

{¶ 28} Under similar circumstances to those presented in this case, other Ohio courts have held that a finding by the juvenile court that the circumstances described in R.C. 2151.414(B)(1)(a) exist was not against the manifest weight of the evidence. *See In re T.H.,* 5th Dist. No. 20CA000003, 2020-Ohio-3571 (Trial court properly granted permanent custody to children services where the record showed the mother failed to complete her case plan and the mother tested positive for THC each time a random drug test was conducted, and failed to obtain stable housing and employment.); *In re S.S.,* 8th Dist. No. 109356, 2020-Ohio-3039 (Trial court did not err when it awarded the children's permanent custody to the county agency because clear and convincing evidence supported a finding that the mother had not addressed her substance abuse issues, her parenting plan objectives, or her mental health issues.); *In re J.J.*, 5th Dist. No. 2019CA00167, 2020-Ohio-1020 (Evidence supported trial court's determination that children could not be placed with mother within a reasonable time or should not be placed with her because she tested positive for drugs 26 times during course of proceedings, including the day of permanent custody hearing.). Here, the testimony in the record supports a finding that S.E. never completed several major components of her case plan including completing random drug screens at ACS, completing an AOD assessment, and participating in a parent mentoring program.

{¶ 29} Based on the foregoing, it is our determination that clear and convincing evidence supports the finding of the juvenile court under R.C. 2151.414(B)(1)(a), that S.E. failed consistently and repeatedly to substantially remedy the conditions causing the children to be placed outside her home. Accordingly, we hold that the juvenile court did not err when it found that the children could not be placed with either parent within a reasonable time or should not be placed with either parent.[1]

---

[1] S.E. argues that alternative findings made by the juvenile court under R.C. 2151.414(E)(2), (3), and (16) are not supported by the evidence and are against the manifest weight of the evidence. Because clear and convincing evidence supports the finding that S.E. failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside the home, S.E. cannot demonstrate prejudice with regard to the alternative findings even if we were to conclude that the evidence does not support them. *In re Franklin*, 3d Dist. No. 9-06-12, 2006-Ohio-4841 (As children were abandoned by their parents pursuant to

{¶ 30} Once the trial court determines that one of the circumstances in R.C. 2151.414(B)(1) applies, the trial court must then determine whether a grant of permanent custody is in the best interest of the child. *In re A.J.,* 2014-Ohio-2734, at ¶ 16; R.C. 2151.414(B)(1).

{¶ 31} In determining the best interest of a child, R.C. 2151.414(D)(1) directs the trial court to consider all relevant factors including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e).

### 1. R.C. 2151.414(D)(1)(a)

{¶ 32} With regard to the interaction and interrelationship of the children with parents, siblings, relatives, and foster caregivers, the evidence shows that S.E. continued to

---

R.C. 2151.414(B)(1)(b), the fact that the trial court also found that termination of the parents' rights was proper under R.C. 2151.414(B)(1)(d) based upon an erroneous calculation of the time the children were within the agency's custody was harmless error because the custody award was in the best interest of the children pursuant to R.C. 2151.414(D).); *In re C.C.,* 12th Dist. No. CA2011-11-1113, 2012-Ohio-1291 (Trial court did not err in also making a finding that parents' children could not be placed with the parents within a reasonable time under R.C. 2151.414(B)(1)(a) after correctly determining that the children were abandoned as nothing prevented a trial court from making alternative findings and mother could not establish any prejudice.).

participate in weekly visits with her three children on a regular basis throughout these proceedings and that the children are bonded with S.E. On the other hand, Schilling testified that both A.E. and A.J. "are doing wonderful in the foster home. They are very bonded to the foster mother." (Oct. 21, 2019 at Tr. 25-26.) According to the GAL, A.J. has expressed some regret that she will not be able to maintain a relationship with M.J., but that she now understands M.J. is not her mother. The GAL also related that A.J. has "really embraced A.E. * * * kind of like her baby brother." (Oct. 21, 2019 Tr. at 26.) Though A.J. and A.E are also bonded with W.P. and he with them, the evidence shows that W.P. has exhibited "aggressive" behavior toward A.E. (Oct. 21, 2019 Tr. at 26, 34.) The record also shows that efforts to place A.J. with other relatives has not been successful.

### 2. R.C. 2151.414(D)(1)(b)

{¶ 33} As expressed by the GAL in his report and testimony, A.J. desires a return to the home of M.J. but she now understands that S.E. is her biological mother. W.P. wishes to be reunited with S.E., and A.E. was too young to express his wishes

{¶ 34} With respect to W.P.'s wishes, the GAL testified as follows: "I don't really know how much W.P.'s able to really comprehend cause he was -- he's really I think he's focused on -- getting out of residential and I think he -- he might have some unrealistic expectations of what that's gonna look like." (Oct. 21, 2019 at Tr. 45.)

### 3. R.C. 2151.414(D)(1)(c)

{¶ 35} As set forth above, and as shown in stipulated exhibit 1, the three children have had a complicated custodial history. Over the three years, FCCS has been involved with A.E. and W.P., they have resided intermittently with their maternal grandmother, E.W., a family by the name of Willard, and their foster mother. They resided with their mother for a little more than four months in 2017 before S.E. relapsed and they were removed from the residence. At the time of the permanent custody hearing, A.E. was residing with his sister, A.J., and his foster mother. W.P. was in a residential treatment facility.

{¶ 36} At the time FCCS became involved with A.E. and W.P., S.E.'s other child A.J. was in the custody of M.J. and her partner. A.J. has never resided with her mother. A.J. was subsequently removed from M.J.'s care and she resided, alternatively, with her

maternal grandmother, E.W., the Willards, and her foster mother.  A.J. was living with her foster mother at the time of the permanent custody hearing.

### 4. R.C. 2151.414(D)(1)(d)

{¶ 37}  The juvenile court found that the evidence supported FCCS' claim that legally secure permanent placement "cannot be achieved without a grant of permanent custody of these children to the agency."  (Dec. 23, 2019 Decision at 14.)   Clear and convincing evidence supports this finding as the evidence relevant to this factor establishes that W.P. suffers from ADHD, A.J. suffers from PTSD, and A.E.'s delayed cognitive development has rendered him essentially non-verbal.  According to Schilling, W.P. also had "some  issues in  the  foster home * * * he's  just really aggressive towards A.E. * * * he needs to have * * * intensive daily therapy."  (Oct. 21, 2019 at Tr. 26.)  W.P. is currently residing at a residential treatment center and a date for his release has yet to be determined.

{¶ 38}  Schilling testified that the foster mother has expressed a desire to adopt both A.E. and A.J. and that she is willing to adopt W.P. if he is successfully released from residential care.

{¶ 39}  "In reviewing a judgment granting permanent custody to FCCS, an appellate court 'must make every reasonable presumption in favor of the judgment and the trial court's findings of facts.' "  *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 8, quoting *In re P.G.,* 10th Dist. No. 11AP-574, 2012-Ohio-469, ¶ 37.  " ' "[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment." ' "  *In re A.S.*, 2021-Ohio-218, at ¶ 17, quoting *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 59, quoting *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988).  "Judgments are not against the manifest weight of the evidence when all material elements are supported by competent, credible evidence."  *In re J.T.*, 2012-Ohio-2818,  at ¶ 8, citing *C.E. Morris Co. v. Foley Contr. Co.*, 54 Ohio St.2d 279 (1978).

{¶ 40}  Here, the relevant best interest factors compel a finding that an award of permanent custody to FCCS is in the best interest of all three children.  More particularly, the diverse and special needs of all three children, their chaotic custodial history to date, and their immediate need for legal secure placement weigh heavily in favor of the juvenile court's determination.  S.E. argues, however, that evidence does not support a finding that

her drug use is so debilitating that she will be unable to care for her children within a reasonable period of time. This argument is flawed for several reasons. First, S.E. has never demonstrated in the three years since FCCS first became involved with this family that she can maintain a drug-free lifestyle. Second, even if the record supported a finding that S.E. can eventually remedy the illegal drug use that led to the removal of her children by FCCS, S.E. has completely failed to acquire the parenting skills necessary to effectively raise her three children given their special needs. Finally, as set forth above, the need of these three children for a legally secure permanent placement is immediate.

{¶ 41} "[T]he focus of the best interest determination is upon the child, not the parent, as R.C. 2151.414(C) specifically prohibits the court from considering the effect a grant of permanent custody would have upon the parents." *In re K.M.,* 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 19, citing *In re Awkal*, 95 Ohio App.3d 309, 315 (8th Dist.1994). Because the record contains clear and convincing evidence that an award of permanent custody to FCCS is in the best interest of all three children, we hold that the judgment of the juvenile court is not against the manifest weight of the evidence. Accordingly, we overrule S.E.'s third assignment of error.

## B. Second Assignment of error

{¶ 42} In her second assignment of error, S.E. contends that she received ineffective assistance of counsel during the permanent custody proceedings. We disagree.

{¶ 43} "The Supreme Court of Ohio has described the permanent termination of parental rights as ' " the family law equivalent of the death penalty in a criminal case." ' " *In re C.P.*, 187 Ohio App.3d 246, 2010-Ohio-346, ¶ 12 (10th Dist.), quoting *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (1991). "Therefore, parents ' "must be afforded every procedural and substantive protection the law allows." ' " *Id.*

{¶ 44} In order to succeed on her claim of ineffective assistance of counsel, appellant must satisfy a two-prong test. *In re C.P.*, 10th Dist. No. 08AP-1128, 2009-Ohio-2760, ¶ 58. First, she must demonstrate that her trial counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This requires a showing that her counsel committed errors which were "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* If she can show deficient performance, she must

next demonstrate that there exists a reasonable probability that, but for her counsel's errors, the result of the trial would have been different.  *Id.* at 694.  "[T]he burden of showing ineffective assistance of counsel is on the party asserting it."  *In re C.P.* at ¶ 57, citing *State v. Smith*, 17 Ohio St.3d 98, 100 (1985).

{¶ 45}  S.E. argues that the performance of her trial counsel was deficient because of a failure to interpose an objection to certain hearsay evidence regarding her drug use.  More particularly, S.E. claims that Schilling's testimony that she tested positive for suboxone, cocaine, and marijuana in ACS drug screenings conducted in September and October 2019 is inadmissible hearsay to which no exception applies.

{¶ 46}  Juv.R. 34(I) states that the rules of evidence shall apply in a hearing on a motion for permanent custody.  Thus, hearsay is inadmissible in such a proceeding unless it falls within a recognized exception to the hearsay rule.  *In re C.H.,* 9th Dist. No. 12CA0055, 2013-Ohio-633, ¶ 23.  "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Evid.R. 801(C).  Generally, hearsay is not admissible unless one of several exceptions to the hearsay rule is applicable.  *See* Evid.R. 802 through 807.  However, Evid.R. 801(D) specifies certain out-of-court statements are not considered hearsay, such as a party's own statement under Evid.R. 801(D)(2)(a), or a statement of which the party has manifested an adoption or belief in its truth, under Evid.R. 801(D)(2)(b).

{¶ 47}  On direct examination, Schilling testified as follows:

> Q. And in relation to the drug screens, can you describe what mom's compliance has been with drug screens?
>
> A. We -- she hasn't -- we had an -- a semi-annual review in September and she admitted to us using cocaine at the SAR. She took drug screens on September 18th, September 20th, September 24th, October 3rd, October 4th, and October 11 and they were all positive for suboxone, cocaine and marijuana. To my knowledge she doesn't have a prescription for suboxone.  Prior to the September 18th drug screen that she took for us, she hadn't completed an ACS screen since September 2018.
>
> Q. I'm sorry, what was that year?

A. 2018.

(Oct. 21, 2019 Tr. at 18-19.)

{¶ 48} S.E. relies on *In re McLemore*, 10th Dist. No. 03AP-714, 2004-Ohio-680, in support of her argument that her counsel's failure to object to the testimony about the positive screens constituted deficient performance. In the *McLemore* case, this court reversed a judgment granting permanent custody to FCCS because the trial court had relied upon erroneously admitted hearsay in concluding that the mother had failed to complete a major aspect of her case plan. At the permanent custody hearing in *McLemore*, appellant's probation officer was permitted to testify, without objection, that six of appellant's nine urine screens had tested positive for marijuana. The urine screens were required as a condition of appellant's probation, they were conducted by a laboratory associated with the common pleas court, and the results were contained in a laboratory report that was never admitted into evidence in the permanent custody case.

{¶ 49} This court concluded that because the probation officer's testimony was "offered to prove the truth of the matter asserted, i.e., that appellant tested positive for marijuana" it was inadmissible hearsay. *Id.* at ¶ 9. We further stated that "[a]lthough some hearsay may be admissible as an exception to the general prohibition of hearsay, 'there is no hearsay exception, either in Evid.R. 803 or 804, that allows a witness to give hearsay testimony of the content of business records based only upon a review of the records.' " *Id.*, quoting *St. Paul Fire & Marine Ins. Co. v. Ohio Fast Freight, Inc.*, 8 Ohio App.3d 155, 157 (10th Dist.1982). Accordingly, this court held that the admission of the testimony amounted to plain error. *Id.* at ¶ 13.

{¶ 50} FCCS argues that Schilling's testimony is admissible under the hearsay exception set forth in Evid.R. 803(8) and this court's decision in *In re H.D.D.,* 10th Dist. No. 12AP-134, 2012-Ohio-6160. In that case, the parents asserted that the magistrate, in recommending temporary custody to FCCS, erred in admitting into evidence: (1) toxicology reports reporting that H.D.D. tested positive for cocaine, barbiturates, and opiates; (2) testimony by Dr. Ahmed that mother had tested positive for drugs and lacked prenatal care; and (3) testimony by the caseworker that father had twice tested positive for marijuana. In considering the hearsay issue, we noted that laboratory test results contained in authenticated records fall within the business records exception to the hearsay rule when

supported by testimony that the laboratory report was kept in the course of regularly conducted business and where the challenger to the test results failed to present substantial credible evidence that the laboratory procedures and results were untrustworthy. *Id.* at ¶ 39, citing *Belcher v. Ohio State Racing Comm.*, 10th Dist. No. 03AP-786, 2004-Ohio-1278, ¶ 12 (positive laboratory test results for narcotic Dilaudid held to be admissible). *See also In re Brock,* 12th Dist. No CA98-03-027 (Oct. 5, 1998) (Children's service agency employee's testimony regarding reports prepared by the agency are covered under the public records hearsay exception.). *See* Evid.R. 803(8).[2]

{¶ 51} " ' Judicial scrutiny of counsel's performance must be highly deferential. * * * A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099, ¶ 41, quoting *Strickland*, 466 U.S. at 689. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland* at 686.

{¶ 52} In this instance, due to the lack of an objection, the source of Schilling's knowledge of the positive drug screens in September and October 2019 is not clear. It is, therefore, difficult to determine whether FCCS could have established a foundation for the admission of the test results under a recognized hearsay exception. Nevertheless, the question whether FCCS could have established such a foundation is not dispositive of S.E.'s ineffective assistance of counsel claim because the record permits the inference that counsel's lack of objection was a result of trial strategy rather than deficient performance.

{¶ 53} "In analyzing the first prong under *Strickland*, there is a strong presumption that defense counsel's conduct falls within a wide range of reasonable professional assistance." *In re S.G.*, 10th Dist. No. 10AP-442, 2010-Ohio-5722, ¶ 20, citing *Strickland* at 689. A properly licensed attorney is presumed competent. *In re C.P.*, 2009-Ohio-2760,

---

[2] *In re H.D.D.* is distinguishable on grounds that Juv.R. 34(B)(2) provides that hearsay may be admitted in dispositional hearings, whereas Juv.R. 34(I) provides that the Rules of Evidence shall apply in hearings on motions for permanent custody. The hearsay analysis is nevertheless instructive.

at ¶ 57, citing *Vaughn v. Maxwell*, 2 Ohio St.2d 299, 301 (1965). "Trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance." *In re C.P.*, 2009-Ohio-2760, at ¶ 57, citing *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). "Tactical or strategic trial decisions, even if ultimately unsuccessful, do not generally constitute ineffective assistance." *In re S.G.* at ¶ 20, citing *State v. Carter*, 72 Ohio St.3d 545, 558 (1995). "[E]ven debatable trial tactics do not establish ineffective assistance of counsel." *In re C.P.*, 2009-Ohio-2760, at ¶ 57.

{¶ 54} On cross-examination by S.E.'s counsel, Schilling made the following admissions:

> Q. Was there ever a time in the case when you were a part of the case where she had a period of clean screens?
>
>  A. Yes.
>
> Q. What was -- when were those screens?
>
> A. When [R.E.] was in jail.
>
> Q. So that would have been over nine months ago?
>
> A. Well, no. In the -- this would have been  in 2016 -
>
> Q. Oh.
>
> A. - to middle of 2017, he was in jail.
>
> Q. Okay. So,  from -- so for that was that about six months you would say?
>
> A. I -- he was incarcerated longer than that, but I would say at the beginning of 2017, she was testing negative for us.
>
> Q. Oh, okay. And since that time there was also parts, there were times when she was not testing for you?
>
> A. Yes. From September 2018 until just last month.

(Oct. 21, 2019 Tr. at 29-30.)

{¶ 55} Had S.E.'s trial counsel interposed a successful objection to Schilling's testimony about S.E.'s positive drug screens, the juvenile court would likely have excluded testimony about her negative drug screens as well. Given the evidence in the record that S.E. and R.E. are currently living apart and her contention that she could have been successfully reunited with her children within a reasonable time following drug treatment, we cannot say that the decision to permit Schilling to testify about positive drug screens amounted to deficient performance. Absent evidence of S.E.'s negative drug screens, the

juvenile court would have been presented with no favorable evidence regarding S.E.'s potential for recovery.  *See In re E.B.*, 2d Dist. No. 2011 CA 13, 2012-Ohio-2231, ¶ 34.

{¶ 56} Moreover, even if we were to conclude that counsel's performance was deficient in failing to object to Schilling's testimony about the positive drug screens, S.E. has not satisfied her burden of demonstrating a reasonable probability that, but for her counsel's errors, the result of the custody hearing would have been different.  In the *McLemore* case, the mother's case plan required her take parenting classes, attend counseling to deal with anger and stress management, maintain independent housing, refrain from drug use, and meet all of her daughter's needs.  In reversing the custody ruling, this court  stated: "based on the trial court's significant reliance on appellant's positive drug tests in terminating her parental rights, the admission of that evidence was plain error and warrants a reversal of this matter."  *Id.* at ¶ 13.  There is no indication in the *McLemore* decision that mother failed to complete her case plan in any other respect.

{¶ 57} Here, the juvenile court decision mentions that S.E. had several positive drug screens in September 2019.  However, it is clear from the juvenile court's decision that the positive drug screens were given minimal consideration in reaching the custody determination as the decision references an abundance of unrebutted and admissible evidence in support of the juvenile court's finding that S.E. failed to substantially remedy the circumstances that led to the removal of her children.  This evidence includes S.E.'s failure to submit to drug screening for more than one year between August 2018 and September 2019, her admission during the 2019 semi-annual review that she is actively using cocaine, her admitted relapses into drug addiction while caring for A.E. and A.J., her failure to complete the required AOD assessment and the parenting classes, her admitted cognitive delay, and the recommendation of the GAL.

{¶ 58} Here, unlike *McLemore*, the record and the juvenile court's decision forecloses a reasonable probability that the results of the custody hearing would have been different but for her counsel's failure to object to the positive screening results.  *See In re T.V.,* 10th Dist. No. 04AP-1159, 2005-Ohio-4280, ¶ 58 (In distinguishing *McLemore*, this court stated that "we cannot say that the caseworker's testimony about the positive drug screens was a significant factor in the court's decision or that the outcome would have been different if the court had excluded the testimony.  Thus, admission of the hearsay testimony

does not provide grounds to overturn the court's decision."). *See also In re L.T.,* 2d Dist. No. 26922, 2016-Ohio-605, ¶ 19 ("Based on all of the evidence admitted at the permanent-custody hearing—including other evidence of Mother's drug usage, her failure to complete a drug assessment, and her multiple shortcomings with regard to her case plan * * * [caseworker's] hearsay testimony about the specific drug-test results was harmless."); *In re E.B.,* at ¶ 27 (In a permanent custody case, inadmissible hearsay evidence regarding mother's drug screen results was harmless because even without the results, there was substantial evidence that mother had been abusing drugs for many years and had not yet successfully completed drug treatment.). On this record, we find that any error on the part of S.E.'s trial counsel with respect to the testimony about positive drug screens did not rise to the level of ineffective assistance under *Strickland* because S.E. did not prove that, but for counsel's error, there was a reasonable probability of a different outcome.

{¶ 59} Based on the foregoing, we overrule appellant's second assignment of error.

**C. First Assignment of error**

{¶ 60} In her first assignment of error, S.E. argues that W.P. was denied his right to counsel in the permanent custody hearing because his court-appointed attorney had a conflict of interest that resulted in a failure to advocate W.P.'s wishes regarding custody. We disagree.

{¶ 61} At the outset of our discussion, we note that appellant's assignment of error does not allege that the juvenile court erred by failing to appoint separate legal counsel to represent W.P. Rather, S.E.'s claim is that, because of a conflict of interest, W.P.'s legal counsel provided ineffective assistance to W.P. during the permanent custody hearing.[3]

{¶ 62} Even though this case does not involve a *In re Williams*-type conflict, S.E. claims that a conflict of interest arose out of W.P's expressed desire to reunite with his

---

[3] We nevertheless disagree with S.E. that *In re Williams,* 101 Ohio St.3d 398, 2004-Ohio-1500, supports S.E.'s conflict of interest argument. In that case, the Supreme Court of Ohio held that R.C. 2151.281(H) and Juv.R. 4(C) requires the appointment of independent counsel for the child in certain circumstances, such as when the child has repeatedly expressed a strong desire for reunification that differs and is otherwise inconsistent with the GAL's permanent custody recommendation. *Id.* at ¶ 18; *see also In re A.D.,* 12th Dist. No. CA2011-06-100, 2011-Ohio-5979, ¶ 52; *In re B.K.,* 12th Dist. No. CA2010-12-324, 2011-Ohio-4470, ¶ 19. Here, the juvenile court appointed independent legal counsel for the three children when the GAL informed the court that his duties as legal counsel for W.P. conflicted with his duties as GAL for W.P. The juvenile court, therefore, complied with the requirements of R.C. 2151.281(H), Juv.R. 4(C), and *In re Williams.* S.E. has not cited any case law supporting her contention that *In re Williams* requires appointment of independent counsel for the child when the alleged conflict of interest does not involve the GAL, nor has our research uncovered any such case law.

mother and the conflicting desires of his two siblings, A.E. and A.J.  FCCS has responded with several arguments in opposition to this assignment of error.  First, FCCS argues that S.E. does not have standing to raise this issue on behalf of W.P.  Second, FCCS argues that even if S.E. has standing, she waived the argument by failing to raise it in the juvenile court. Finally, FCCS argues that S.E.'s conflict of interest claim fails because the record does not support the existence of an actual or apparent conflict of interest.

{¶ 63} With regard to the standing issue, in this court's prior decision in *In re Johnson*, 10th Dist. No. 03AP-1264, 2004-Ohio-3886, we noted that an appealing party may complain of an error committed against a nonappealing party only when the error is prejudicial to the rights of the appellant.  *Id.* at ¶ 12, quoting *In re Smith*, 77 Ohio App.3d 1, 15 (6th Dist.1991), citing *State v. Ward,* 9th Dist. No. 13462 (Sept. 21, 1988). In the context of a permanent custody determination by the juvenile court, this court stated that when the interests of the parents are aligned with the interests of the child on the issue of reunification any error prejudicial to the children's interest in reunification is similarly prejudicial to the parents' interest.  *Id.* at ¶ 12, quoting *In re Smith* at 15. In such circumstances, the parents would have standing to assert an assignment of error alleging that the minor child was denied effective legal counsel. *Id.  See also In re Lau*, 6th Dist. No. L-17-1015, 2017-Ohio-7384, ¶ 30-31 (parents of six minor children asserted an assignment of error alleging the juvenile court erred by overruling their objection to appointed counsel's continued representation of the one child who had expressed a desire for reunification.). Here, the wishes of S.E. and W.P. are aligned with respect to reunification.  Accordingly, S.E. has standing to assert an assignment of error alleging that W.P. was denied effective legal counsel due to a conflict of interest.

{¶ 64} However, even though S.E. has standing to assert an assignment of error alleging that W.P. was denied effective legal counsel due to a conflict of interest, S.E. did not preserve the argument for purposes of appeal because she failed to raise the alleged conflict in the juvenile court.  Consequently, S.E. waived all but plain error with regard to the alleged conflict of interest.  *See In re S.B.* at ¶ 22 (The manner in which the juvenile court handles the dual roles of the guardian ad litem and attorney for the child is subject to the waiver rule where it is not raised in the juvenile court.); *In re J.S.,* 10th Dist. No. 05AP-615, 2006-Ohio-702, ¶ 15 (Even if the mother had standing to assert assignment of error

on behalf of her child, she arguably waived all but plain error because she never requested the appointment of independent counsel to represent the children and never objected to the GAL's appointment as legal counsel for the children.); *compare In re Lau.* at ¶ 30-31 (parents preserved ineffective assistance claim for purposes of appeal by objecting to appointed counsel's continued representation of their one child who desired reunification.).

{¶ 65} The attorney-client relationship between independent legal counsel and the children is nevertheless governed by the Ohio Rules of Professional Conduct, and in particular Prof.Cond.R. 1.7 dealing with conflicts of interest. *Dayton Bar Assn. v. Parisi*, 131 Ohio St.3d 345, 2012-Ohio-879. Rule 1.7 entitled "Conflict of interest: current clients," provides in relevant part as follows:

> (a) A lawyer's acceptance or continuation of representation of a client creates a conflict of interest if either of the following applies:
>
> (1) the representation of that client will be directly adverse to another current client;
>
> (2) there is a substantial risk that the lawyer's ability to consider, recommend, or carry out an appropriate course of action for that client will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by the lawyer's own personal interests.

{¶ 66} Here, the record does not support a finding that W.P.'s wishes directly conflict with the wishes of A.E. and A.J. As noted earlier, A.E. is too young to express his wishes regarding reunification and his developmental delay has rendered him essentially non-verbal. Because A.E.'s desires are essentially neutral with regard to reunification, no conflict arises out of the dual representation of W.P. and A.E. Moreover, "when a child is 'unable to express a position regarding custody or to assist an attorney in pursuing a particular course of action,' an attorney would be able to advocate only what the attorney believed to be in the child's best interests." *In re D.M.*, 4th Dist. No. 14CA22, 2016-Ohio-1450, ¶ 33, quoting *In re T.J.*, 2d Dist. No. 23032, 2009-Ohio-1290, ¶ 10.

{¶ 67} Similarly, though A.J. has expressed a desire in these proceedings to reunite with M.J., the juvenile court removed A.J. from M.J.'s home due to M.J.'s documented criminal record and unresolved issues with substance abuse. Moreover, M.J. withdrew her previously filed motion for custody. Because A.J.'s placement with M.J. was not a

possibility, we perceive no actual or apparent conflict of interest arising from the dual representation of W.P. and A.J.

{¶ 68} Finally, though the record does reveal that A.J. is strongly bonded with A.E., the record does not reveal a similarly strong bond between W.P. and his two younger siblings. The evidence shows that W.P. and A.J. have lived apart for most of their lives and that W.P. is "really aggressive towards [A.E.]." (Oct. 21, 2019 Tr. at 26.) Furthermore, while W.P. has expressed a desire for reunification with S.E., there is no evidence that W.P. has expressed a strong desire for reunification with his two younger siblings. Thus, the record does not demonstrate that there is a substantial risk that counsel's ability to consider, recommend, or carry out an appropriate course of action for W.P. would be materially limited by counsel's responsibilities to his siblings. Because the record does not demonstrate either an apparent or actual conflict arising from counsel's dual representation of W.P. and his two siblings, we find no error on the part of the juvenile court in regard to W.P.'s representation, let alone plain error.

{¶ 69} Moreover, we find no merit to S.E.'s contention that W.P.'s counsel provided ineffective assistance under the *Strickland* standard.

{¶ 70} S.E. first contends that counsel performance was deficient in failing to support her attorney's oral motion to continue the hearing. The transcript reveals the following proceedings occurred at the outset of the permanent custody hearing:

> MR. MILLER: Okay. I would like to just put on the record a request for a continuance. My client is in Maryhaven at the moment, so I would say that she is unable to be here due to medical -- the medical treatment that she's receiving in Maryhaven, but I had been in contact with her recently, so I do know her wishes. But I would ask for the continuance on her behalf so that she could be here.
>
> * * *
>
> MS. MONCIF: I would ask to go forward also, Your Honor. The children, like Brian said, the children need permanency and the relatives were talking this morning about mom being in Florida, so I'm not sure why mom isn't here, but this is an important time, so I would ask that we go forward also.
>
> JUDGE GILL: All right. Are you-- you're attorney for all three children?

MS. MONCIF: Yes, Your Honor.

(Oct. 21, 2019 Tr. at 5, 7.)

{¶ 71} The record shows that FCCS had been involved with this family for more than three years at the time of the permanent custody hearing. As of the date of the permanent custody hearing, the record included numerous annual and semi-annual reviews which were filed in the case and adopted by the juvenile court. Those reviews and other portions of the juvenile court record in all three cases reveal almost no progress by S.E. with regard to critical requirements of the case plan. Moreover, at the start of the permanent custody hearing, S.E.'s counsel indicated that S.E. had only just entered an in-patient rehabilitation program.

{¶ 72} Furthermore, S.E.'s counsel did not express a great deal of confidence in the merits of the motion when he stated: "I would like to just put on the record a request for a continuance." (Oct. 21, 2019 Tr. at 5.)

{¶ 73} The transcript also reveals that W.P.'s counsel had not been previously informed that S.E. had entered Maryhaven and, as she stated for the record, the information she received from family members on the morning of the permanent custody hearing contradicted the representations made by S.E.'s counsel in support of the motion for a continuance. Accordingly, on this record, even if we were to conclude that W.P.'s counsel should have joined in the motion to continue the permanent custody hearing, we cannot say that there was a reasonable probability that the motion would have been granted.

{¶ 74} S.E. claims that the record also evidences deficient performance on the part of W.P.'s counsel during the examination of Schilling and the GAL. According to S.E., had counsel engaged in a thorough cross-examination of Schilling and the GAL, she could have elicited favorable testimony demonstrating the bond W.P. had with S.E., as well as S.E.'s attentiveness toward her children at the weekly visits. That very testimony was, however, elicited from both witnesses in this case. Moreover, given the GAL's recollection of S.E.'s actual involvement with the children at the weekly visits, further examination of the witnesses on this issue may not have been helpful to W.P.

{¶ 75} S.E. also argues in support of this assignment of error that counsel could have followed up with these witnesses about S.E. "testing clean." (S.E.'s Brief at 40.) This

argument is in direct opposition to her claim in the second assignment of error that such evidence is inadmissible hearsay.  Moreover, as we noted in our prior discussion of S.E.'s second assignment of error, evidence of negative drug screens in 2016 was elicited by S.E.'s counsel in his cross-examination of Schilling.  We find it implausible that even the most thorough cross-examination of these witnesses by W.P.'s counsel could have produced admissible evidence to support S.E.'s claim that reunification would be possible within a reasonable period of time given S.E.'s recent admission into drug rehabilitation and W.P.'s continued placement in a residential treatment facility.  Such a claim is based on pure speculation, not evidence, and it lends little support to her ineffective assistance claim.

{¶ 76}  Lastly, S.E. contends that a statement made by W.P.'s counsel at the close of the evidence demonstrates ineffectiveness.  The record reveals that W.P.'s counsel made the following statement when asked by the juvenile court if there was any other evidence to be presented on behalf of the children:

> MS. MONCIF: I'd just say, Your Honor, the children told me the same thing. They really wanted to be with mother. [A.J.] wanted to be with [M.J.].  I did ask them who would be their second choice and both did say the foster family and I had the same issue with [A.E.], he's just-- it's hard to communicate with him, but I do believe PCC is in the children's best interest also. Thank you.

(Oct. 21, 2019 Tr. at 52.)

{¶ 77}  Even though counsel did inform the court that W.P. "really wanted to be with mother," we acknowledge that the recommendation made by counsel conflicts with the wishes expressed by W.P. in this matter.  Nevertheless, it is abundantly clear from the juvenile court's decision that the ruling on the motion for permanent custody was grounded exclusively in the evidence presented at the permanent custody hearing and the record in the three cases.  The juvenile court set forth the bases for the decision as follows:

> The Court has carefully and thoughtfully reviewed the testimony, the evidence presented, the entire file, the *Report* and testimony of the Guardian ad Litem, and the applicable law.  The Court has carefully observed each witness's demeanor, gestures, and voice inflections during his testimony in determining the credibility of and weighing the testimony and evidence presented.  The omission of a specific finding herein as to every piece of evidence presented should

> not and does not suggest that the Court did not consider a fact
> and/or evidence in arriving at the ultimate decision herein.

(Emphasis sic.) (Oct. 23, 2019 Decision at 15-16.)

{¶ 78} The juvenile court did not mention the recommendation of W.P.'s counsel in the decision on permanent custody to FCCS. To the contrary, in discussing "other factors" that were relevant to the best interest analysis, the juvenile court stated: "[t]he FCCS Child welfare Case worker and Guardian ad Litem believe it is in the best interest of the children for the Court to grant FCCS' Motion and to allow the children to be placed for adoption." (Oct. 23, 2019 Decision at 15.)

{¶ 79} It is axiomatic that statements made by legal counsel are not evidence. Because every indication in the juvenile court's permanent custody decision and elsewhere in the record reveals that a recommendation of reunification by W.P.'s counsel would not have been considered by the juvenile court in awarding permanent custody to FCCS, we conclude that S.E. failed to carry her burden under the second prong of the *Strickland* test for ineffective assistance of counsel.

{¶ 80} For the foregoing reasons, S.E.'s first assignment of error is overruled.

## IV. CONCLUSION

{¶ 81} Having overruled appellant's three assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

KLATT and BEATTY BLUNT, JJ., concur.

_____